# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| STACEY KOTLER,<br><br>          Plaintiff,<br><br>        v.<br><br>SHIPMAN ASSOCIATES, LLC,<br>a Delaware limited liability company,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **C.A. No. 2017-0457-JRS** |

## MEMORANDUM OPINION

Date Submitted: May 15, 2019
Date Decided: August 21, 2019
Corrected: August 27, 2019

A. Thompson Bayliss, Esquire, Adam K. Schulman, Esquire and Daniel J. McBride, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware and Steve Wolosky, Esquire and Renée M. Zaytsev, Esquire of Olshan Frome Wolosky LLP, New York, New York, Attorneys for Plaintiff Stacey Kotley.

Blake Rohrbacher, Esquire, Kevin M. Gallagher, Esquire, John M. O'Toole, Esquire and Ryan D. Konstanzer, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendant Shipman Associates, LLC.

**SLIGHTS, Vice Chancellor**

Marissa Shipman ("Marissa") began making cosmetics in her kitchen in 1999.[1] She formed The Balm.com, Inc. later that year and changed the company's name to Shipman Associates, Inc. four years later.[2] In 2003, Marissa hired her friend, Stacey Wexler (now Stacey Kotler), to sell The Balm cosmetics as an independent contractor. By all accounts, Kotler was a highly effective salesperson and the Company flourished.

The Company paid Kotler only on sales commissions. Accordingly, after she had demonstrated her worth to the Company, as reflected in the Company's steady growth, Kotler asked the Company to reward her with equity. Marissa's father, Robert Shipman ("Robert"), had joined the Company soon after its formation to assist his daughter with the business side of the Company's operations. Robert responded to Kotler's inquiry about equity, in essence, by telling her that she deserved equity and assuring her the Company would work with her to make that happen. Over time, as the Company seemed to string her along, Kotler would renew her request for equity and Mr. Shipman would renew his response. Still, nothing happened. All the while, the Company continued to grow.

---

[1] I refer to the Shipmans by first name to avoid confusion.

[2] As explained below, in 2014, Shipman Associates, Inc. (the "Company") became Defendant, Shipman Associates, LLC.

1

Eventually, the discussions turned from providing Kotler with straight equity to granting her a warrant to purchase shares. Over several months in 2006 and early 2007 the parties exchanged drafts of a warrant agreement. Both sides engaged counsel to assist in the negotiations. The Company engaged White & Case LLP; Kotler cannot recall the name of the attorney or law firm she hired.

The evidence regarding the negotiations leading to the execution of the warrant agreement is thin. Neither side retained emails nor other correspondence and neither side can recall specific discussions. The only contemporaneous evidence of any real value are the various drafts of the warrant agreement. These drafts reflect that the Company wanted to condition the grant of the warrant on Kotler's agreement to a perpetual post-separation non-competition/non-solicitation covenant. Kotler would agree only to a pre-separation non-compete or, at most, a non-compete with an 18-month tail. Neither side recalls ever having altered their respective position on this material term. Nevertheless, both parties believed they had reached agreement and signed a binding warrant agreement in 2007. The problem is, given the haphazard manner in which drafts were exchanged, the parties were not signing the same draft of the agreement and the key non-compete language was never agreed to.

Kotler eventually left the Company to start a business that sold cosmetics for companies that competed with the Company. She had sporadic contact with the

2

Company after she left. In 2013, as the Company was considering a sale or reorganization that might trigger the warrant, the Company discovered that Kotler had previously sent the Company a signed version of the warrant that contained language, including non-compete language, that neither Marissa nor Robert had seen before much less agreed to. When Kotler was contacted about the discrepancy, she advised the Company that she had a version of the warrant with "wet ink" signatures that contained only a pre-separation non-compete covenant. The Company cried "fraud." Kotler alleged the Company was attempting to shirk its commitment to give her earned equity. She demanded the Company honor the warrant agreement. When the Company refused, this litigation followed.

In this post-trial opinion, I conclude that Kotler has failed to prove the existence of a binding warrant agreement by a preponderance of the evidence. In reaching this conclusion, I acknowledge that my verdict is quite possibly the product of the harsh reality that trials do not always replicate real life events. Trial outcomes are driven by burdens of proof and evidence as gathered and presented to the factfinder. In this case, Kotler proved to be an incomplete and unreliable historian, the drafting history was inconclusive and the circumstances surrounding the final execution of the warrant agreement supported the Company's version of events as much as, if not more than, Kotler's version. Under these circumstances, judgment must be entered for the Defendant.

3

# I. FACTUAL BACKGROUND

I have drawn the facts from the parties' pre-trial stipulation, evidence admitted at trial and those matters of which the Court may take judicial notice.[3] The trial record consists of 415 joint trial exhibits, 553 pages of trial testimony and eight lodged depositions. The following facts were proven by a preponderance of the competent evidence.

## A. Parties and Relevant Non-Parties

Plaintiff, Stacey Kotler, née Wexler, worked for the Company as a sales consultant from 2003 until she resigned in May or June 2009.[4]

Defendant, Shipman Associates, LLC, a Delaware limited liability company, does business as "theBalm Cosmetics."[5] Founded by Marissa Shipman in 1999, the Company was originally known as The Balm.com, Inc.[6] It designs and produces cosmetics, which it then sells around the world.[7]

---

[3] I cite to the Verified Complaint as "Compl. ¶"; the Joint Pre-Trial Stipulation and Order as "PTO ¶"; the joint trial exhibits as "JX #"; and the trial transcript as "Tr. # (witness name)."

[4] Tr. 9:7–8, 57:22–58:2 (Kotler); PTO ¶ 8.

[5] PTO ¶ 9.

[6] JX 128 at 2, 6. In 2003, the Company became known as Shipman Associates, Inc. before becoming Shipman Associates, LLC in 2014. JX 128 at 5.

[7] Tr. 197:6–12 (Marissa).

Non-party, Marissa Shipman, is the Company's founder and CEO.[8]  She provides strategic vision and manages the development of the Company's products.[9]

Non-party, Robert Shipman, Marissa's father, is the President of the Company.[10]  He oversees the Company's cash flow, inventory control and sales.[11]  He and Marissa together have always made the important strategic and financial decisions for the Company.[12]

Non-party, Heather Lourie, is the Company's Chief Operating Officer.[13]  Before joining the Company in July 2017 as a full-time employee, Lourie was hired as a consultant to ready the Company for a sale process.[14]

Non-party, Hillary Chassin, née Seegul, was one of the Company's first employees.[15]  As explained below, Chassin was given a small equity stake in the Company soon after she joined.

---

[8] Tr. 195:16 (Marissa); PTO ¶ 12.

[9] Tr. 200:19 (Marissa).

[10] PTO ¶ 13.

[11] Tr. 402:1–2 (Robert).

[12] Tr. 10:4–14 (Kotler).

[13] Tr. 491:18–19 (Lourie).

[14] *Id.*

[15] Tr. 198:20–22 (Marissa).  During its first few years of operation, the Company had no more than five employees or consultants.  Tr. 10:21–11:2 (Kotler); JX 102 ("Robert Dep.") 43:14–24, 46:23–25, 47:1–4.

Non-party, Oliver Brahmst, an attorney at White & Case LLP, assisted the Company with drafting the warrant.[16]

Non-party, theBalm Cosmetics Holdings, Inc. ("Holdings"), a Delaware corporation, is now the Company's largest unitholder.[17] It has three stockholders: Marissa, Robert and Chassin.[18]

Non-party, Balm DISC, Inc. ("DISC"), is a Delaware corporation formed by Marissa and Robert in 2014 as an interest charge domestic international sales corporation (IC-DISC) under the Internal Revenue Code.[19]

## B. The Company

In 1999, after holding a number of jobs in the media industry, Marissa had an idea to start to a new business. She began making cosmetics in her kitchen.[20] Robert, who was then retired, joined Marissa to help develop her business.[21] The Company

---

[16] PTO ¶ 16.

[17] *Id.* ¶ 10.

[18] *Id.* ¶¶ 10, 14.

[19] *Id.* ¶ 11.

[20] PTO ¶ 9; Tr. 195:19–196:20 (Marissa).

[21] Tr. 197:23–198:11 (Marissa); Tr. 401:8–21 (Robert).

6

was incorporated in Delaware that same year.[22]  At the time, Marissa, Robert and Chassin were the Company's sole stockholders.[23]

Today, the Company sells its cosmetics products in over 100 countries.[24] During 2016 and 2017, the Company took part in a sale process during which its financial advisor valued the Company's equity at over $500 million.[25]  In a 2017 report, *The Wall Street Journal* projected the Company's value as $600–$700 million.[26]

While the Company's revenues saw steady growth, Robert and Marissa continued to run the Company as if it still operated out of Marissa's kitchen.  Of particular relevance here, the Company's record retention practices were, at best, careless.  It appears that Robert stored corporate records in his homes in Connecticut and Florida, and in several locations in California where Marissa worked.[27]  At some point after 2007, the Company lost (or misplaced depending on who one believes) many of its corporate records—including its stock ledger and all issued stock

---

[22] JX 57; PTO ¶ 9.

[23] JX 68 at 3–4.

[24] JX 78 at 8.

[25] JX 84 at 2–3.

[26] JX 87.

[27] Tr. 470:21–24 (Robert) ("Q. The papers were scattered between your homes in Connecticut and Florida and the Company's offices in California.  A. I would say yes.").

certificates.[28]  Consequently, it was forced to hire a consultant to assist in locating or replacing its missing corporate books and records.[29]

## C. Kotler Joins the Company

In 2001, after moving to San Francisco, Kotler became friends with Marissa.[30] Two years later, in 2003, Kotler joined the Company as a sales consultant, though she had no previous cosmetics experience.[31]  Because she was Canadian citizen, she was required to obtain immigration clearance under the North American Free Trade Agreement, which allowed her to work exclusively for the Company.[32]  She never signed a written consulting agreement with the Company; instead, she worked under an oral agreement and a handshake.[33]  Her compensation was based exclusively on

---

[28] *See* JX 68 at 2–3 ("prior to the Reorganization, the original corporate records . . . of the Old Shipman Associates . . . were misplaced and, after an exhaustive search in connection with the Reorganization, the stockholders and the board of directors of the Old Shipman Associates concluded that such original corporate records were lost"); JX 121; JX 101 ("Dennis Dep.") 30:11–13; JX 105 ("Lourie Dep.") 36:25–37:7.  *But see* Tr. 501:23–24 (Lourie) (stating the Company's records "were never lost"); Tr. 283:18–24, 324:5–9 (Marissa); Tr. 419:6–11, 446:9–21 (Robert).  Whether lost or misplaced, it is clear, as Marissa acknowledged, that the Company had issues with "sloppy recordkeeping." Tr. 283:5–7 (Marissa).

[29] JX 68 at 2–3.

[30] Tr. 8:7–13 (Kotler).

[31] Tr. 9:7–8, 104:9–12 (Kotler), Tr. 201:11–202:1 (Marissa); PTO ¶ 8.

[32] Tr. 105:1–21 (Kotler).

[33] Tr. 9:22–24, 12:13–16 (Kotler), Tr. 468:7–469:12 (Robert).

8

sales commissions. Eventually it was agreed that Kotler would earn fifteen percent commission on all of her sales for the Company.[34] Although apparently an independent contractor, she was enrolled in the Company's healthcare insurance plan.[35]

By all accounts, Kotler performed very well in her sales role.[36] She quickly took on greater responsibility at the Company and eventually earned the title "Vice President of Sales and Business Development."[37] Though her oral consulting agreement did not contemplate equity in the Company, Kotler soon began requesting

---

[34] Tr. 12:6–7 (Kotler), Tr. 202:14–23 (Marissa), Tr. 403:1–9 (Robert). The commission rate was later reduced as the Company grew larger. Tr. 12:7–16 (Kotler).

[35] Lourie Dep. 65:6–17.

[36] *See* Tr. 202:9–10, 265:23–266:1 (Marissa) (testifying that Kotler was an "excellent" salesperson, was "very, very good at sales," and "could sell anything to anyone"); Robert Dep. 53:20, 58:18–59:3 (testifying that Kotler performed "well", was "valuable" to the Company and did well in sales); Tr. 11:10–16 (Kotler) (testifying that she "started with a small territory," but her territory "grew exponentially," particularly compared to the Company's only other salesperson at that time, Marissa's sister, Jordana Shipman).

[37] Tr. 11:19–24 (Kotler) ("Within my first year, I went from ten accounts to over a hundred. And at that time Marissa said, 'We'll make you vice president of the company.' And I received my first business card and it was vice president of sales and business development.").

equity.[38]  Out of over 50 former and current Company employees, only Marissa, Robert, Chassin and Alex Britt had ever possessed equity rights in the Company.[39]

From the moment Kotler first requested equity, Robert continued to assure her that the Company would honor her request.[40]  When Kotler renewed her request in September 2004 with a more urgent tone, Robert responded, "[b]e patient, you will have equity shortly and there is no imminent sale of the company[,]" emphasizing he would make it a "priority."[41] During the summer of 2005, Kotler brought up equity again.[42] And, again, Robert dawdled.[43]

---

[38] Tr. 12:17–22, 106:21, 111:10–22 (Kotler); PTO ¶ 15; JX 65.  *See also* Tr. 202:17–19, 206:10–12 (Marissa) ("[Kotler] was already making money, so we didn't need to incentivize her to come in to be at the company.").

[39] PTO ¶ 14; Tr. 202:18–204:20 (Marissa) (The Company provided Chassin with equity since it "couldn't pay her what she would be making if she took a job somewhere else"— Chassin took a reduced salary in exchange for 5% of the Company.); Tr. 204:2–205:7 (Marissa) (The Company "couldn't afford to pay [Britt] the salary that she deserved[,]" so Marissa promised Britt 1% of any proceeds from a sale of the Company.).

[40] Robert Dep. 53:20, 58:18–59:3, 61:22–62:1; JX 1 (In April 2004, Robert emailed Kotler: "You will have equity.  We are working on it and will have a [sic] ready by May.").

[41] JX 3.

[42] Tr. 17:5–9 (Kotler); JX 116 at 35.

[43] Tr. 17:10–13 (Kotler).

## D. The Company Negotiates a Warrant with Kotler

By early 2007, the Company decided to offer Kotler the right to purchase shares of the Company under certain conditions instead of straight equity.[44] The Company believed a warrant would properly "reward" Kotler for her work and "incentivize" her to remain at the Company.[45]

As requested by the Company, Oliver Brahmst, a partner at White & Case LLP, assisted in drafting versions of the warrant.[46] Brahmst did not communicate directly with Kotler or anyone representing her.[47] Instead, he communicated with Robert, who would then negotiate with Kotler directly.[48]

---

[44] Robert Dep. 64:23–65:4; JX 124; Tr. 206:13–17 (Marissa)

[45] Tr. 301:15–302:12 (Marissa).

[46] JX 112 ("Brahmst Dep.") 18:16–22, 43:11–44:18, 95:6–9; Robert Dep. 90:15–17. Brahmst did not charge for drafting the warrant because Marissa had promised him that she would hire White & Case to represent the Company when she decided it was time to sell. Tr. 207:2–16 (Marissa). Nine years later, the Company did just that. Tr. 237:15–21 (Marissa). Unfortunately, it appears the Company and White & Case are now embroiled in litigation relating to that representation. JX 86; JX 106.

[47] PTO ¶ 16; Tr. 22:3–9 (Kotler), Tr. 207:17–19 (Marissa), Tr. 541:4–6 (Brahmst). Indeed, during the negotiations, Kotler did not even know White & Case was representing the Company in connection with the warrant. Tr. 165:22–24, 166:1–2 (Kotler).

[48] Brahmst Dep. 43:24–25; Robert Dep. 13:8–24; Tr. 206:18–23 (Marissa), Tr. 426:7–13 (Robert).

11

The drafts of the warrant span approximately eight months.[49]  Although the Company designated Robert as the person most knowledgeable about the negotiations of the warrant, he remembered almost nothing about them.[50]  Kotler, likewise, had little to offer by way of specifics.  Indeed, incredibly, she was unable even to recall the name of her counsel or the law firm she engaged to represent her.[51]  With memories purportedly faded, in the age of emails and text messages, one would naturally turn to those sources to gain some understanding of what was happening in real time.  But none exist—neither side could produce contemporaneous emails or text messages of any relevance.[52]  What is left as evidence, then, are the sequential

---

[49] *See* Tr. 23:6–7 (Kotler) ("Q. Over what period of time did you and the company negotiate the warrant?  A. February 2007 to September 2007.").

[50] Robert could recall virtually nothing about when the parties reached agreement, any details regarding the number of shares offered, purchase price, or forfeiture language. Tr. 452:4–6, 430:2–431:11 (Robert).  According to Robert, Kotler simply accepted the terms offered by the Company; there were no "real negotiations."  Tr. 430:4–12, 451:17–19, 426:21–427:3 (Robert) ("We had our lawyers make up a warrant and we presented it to her, and we agreed upon it, and that's all that I know.").  Because she was not directly involved in the negotiations, Marissa also recalled nothing about them.  Tr. 251:11–24 (Marissa).

[51] Tr. 115:3–8, 189:1–190:19, 112:22–113:3 (Kotler) ("I know that it was a legal document. . . .  I knew I had counsel.  I don't remember who proposed changes, made changes.  I don't recall.  And that's the truth.  I don't remember.  I have no emails about it. We couldn't find the lawyer who worked on it.  I don't recall.").

[52] Tr. 112:22–113:3 (Kotler), Tr. 463:14–20 (Robert), Tr. 240:9—241:8 (Marissa).

drafts of the warrant agreement and the few emails relating to those drafts produced by White & Case.[53]

## 1. The February 25 Draft

In February 2007, the Company sent Kotler an initial draft of a warrant agreement (the "February 25 Draft").[54] The February 25 Draft was prepared with the assistance of Brahmst and Julia Popowitz, née Schwartzman, a lawyer who also provided services to the Company.[55]

By all accounts, the February 25 Draft was a "very early version."[56] It granted Kotler the right to purchase "up to 1,055" shares of the Company's common stock.[57] It was governed by Delaware law and did not contain any forfeiture conditions (including non-compete covenants)—though the draft did envision termination of

---

[53] *See, e.g.*, JX 300; JX 301; JX 315.

[54] JX 4; Tr. 21:9–11, 25:19–21, 116:11–13 (Kotler); JX 55. Both parties produced a copy of the February 25 Draft. *Id.* Its metadata, recovered from Kotler's backup drive, demonstrates that the document was "last modified" on February 25, 2007. JX 4; JX 201. A scanned version of the February 25 Draft produced by the Company includes a handwritten note, "Final Stacey Sent 2/26/07." JX 5.

[55] JX 4; Brahmst Dep. 65:9–12; Robert Dep. 63:22–64:16.

[56] Brahmst Dep. 65:18–19 (White & Case "started with some portions of other warrants").

[57] JX 4 at 1.

the warrant rights after 10 years.[58]  Kotler did not agree to or sign the February 25 Draft.[59]

### 2. The June 8 Draft

The Company sent a revised draft of the warrant agreement to Kotler in June of 2007 (the "June 8 Draft").[60]  This draft stated Kotler would have a right to acquire five percent of the Company's equity on a fully diluted basis, which represented 533 Company shares.[61]  This basic understanding remained constant until the very end of the parties' negotiations.

The June 8 Draft also contained a new Section entitled "Forfeiture," providing Kotler would forfeit her warrant if she breached very broad and perpetual non-

---

[58] *Id.* at 1, 5; Tr. 307:19–24, 308:14–18, 309:1–8 (Marissa).  Although this early draft did not contain non-compete or non-solicitation covenants, Marissa maintained the Company would never allow Kotler to take equity in the Company but then compete as soon as her consulting relationship with the Company terminated—it was "a nonstarter."  Tr. 224:3–10, 307:6–14 (Marissa).  When confronted with the absence of these provisions in this initial draft of the warrant agreement, she stated, "[y]ou got to start somewhere." Tr. 309:5 (Marissa)

[59] Tr. 26:9–15 (Kotler).  Indeed, this version does not have a signature block for Kotler. *Id.*

[60] *See* JX 6; Tr. 405:14–23 (Robert); JX 202; Tr. 26:12–15, 116:11–117:17 (Kotler).  The metadata from the June 8 Draft shows that it was "last modified" on June 8, 2007.  JX 202.

[61] JX 6 at 1; Tr. 136:10–15 (Kotler), Tr. 405:10–12 (Robert); JX 103 ("Kotler First Dep.") 86:20–87:4 ("Five percent was the number that was discussed . . . .  To the best of my knowledge, that was a number that was agreed [upon]"); Robert Dep. 101:14 ("I recall it was 5 percent"); JX 209.

compete and non-solicit covenants.[62]  From the Company's perspective, the June 8

Draft included the key terms, the departure from which would break the deal:

Kotler's right to acquire 5% equity in exchange for a perpetual non-compete/non-

solicit.[63]  The June 8 Draft also changed the governing law from Delaware to New

York, where the Company was advised that a perpetual non-compete provision in a

warrant agreement would be enforceable so long as the employee leaves the

company voluntarily.[64]

The June 8 Draft was not ready for execution, however.  Kotler's first name

was spelled incorrectly in the preamble, there still was no signature line for Kotler

and the first page still bracketed the warrant number (for identification in the ledger)

---

[62] JX 6 § 15 ("This Warrant and any and all rights of any Holder set forth herein shall immediately terminate and be forfeited in the event the Original Holder (Kotler) (i) directly owns, manages operates, controls, is employed by or participates in the ownership, management, operation or control of, or is connected in any manner with, any business of the type and character engaged in and competitive with that conducted by the Company or any of its Subsidiaries or their Affiliates"); Tr. 117:21–118:14 (Kotler), Tr. 406:9–18 (Robert), Tr. 207:20–209:3, 224:3–6 (Marissa) (emphasizing that the absence of the Forfeiture terms would be a deal-breaker for the Company).

[63] Tr. 405:10–13, 408:2–3 (Robert); Tr. 306:22–307:1 (Marissa).

[64] JX 6 § 16; Tr. 226:11–13 (Marissa).  *See Lenel Sys. Int'l, Inc. v. Smith*, 106 A.D.3d 1536 (N.Y. App. Div. 2013) (allowing forfeiture of stock options if the employee violates post-employment non-compete covenant).

and the date.[65]  More importantly, Kotler did not approve of the new Forfeiture provision.[66]

### 3.  The August 6 Draft

On August 6, 2007, Brahmst sent Robert a redline of the warrant showing Kotler's proposed edits to the June 8 Draft (the "August 6 Draft").[67]  Although unclear in the record, it appears the parties were negotiating the warrant after the June 8 Draft and counsel was advising Kotler by this time.[68]

---

[65] JX 6 at 1; Tr. 27:15–28:9 (Kotler).

[66] Tr. 28:23–24, 29:1–13 (Kotler).  Of course, as noted, Kotler recalled none of the specifics regarding the negotiations of the Forfeiture provision.  The best she could say was, "[t]his would have been a section that would have been discussed."  Tr. 119:23–24 (Kotler).

[67] JX 8; JX 9; Tr. 210:3–11 (Marissa), Tr. 407:9–21 (Robert).  At his deposition and at trial, Robert acknowledged that he had received the August 6 Draft from White & Case, but nevertheless said it was a "fake."  Tr. 450:18–20, 451:2–8 (Robert); Robert Dep. 109:7–14.

[68] *Id.*; Tr. 24:6 (Kotler) ("I must have had counsel to help me with that agreement.").  Since only Kotler would have benefited from the redlined edits, including the more narrow scope of the Forfeiture provision, it is reasonable to assume that the August 6 Draft incorporates Kotler's proposed edits.  Tr. 210:9–14 (Marissa) (Marissa testifying that Kotler proposed the changes to the forfeiture provision); Tr. 407:16–21 (Robert) (Robert testifying that he "presume[d]" Kotler proposed the edits reflected in the August 6 Draft).  This conclusion is supported by the fact that Kotler's edits never made it into the White & Case system, proving that the Company did not propose them.  In post-trial arguments, Kotler suggests that the edits were not hers because White & Case created JX 9.  Pl.'s Post-Trial Opening Br. 16–17.  I reject this suggestion.  The redline demonstrates Brahmst simply compared two documents saved to his computer desktop.  JX 9 at 28.  In other words, though Brahmst created the redline version, the edits were Kotler's.

16

The August 6 Draft reiterated that Kotler would be granted the right to acquire 533 shares of the Company's common stock.[69] But this draft corrected the spelling of Kotler's name[70] and narrowed the Forfeiture provision by prohibiting Kotler from competing or soliciting only for specified time periods.[71] Kotler—or possibly her counsel—also proposed decreasing the non-solicit lookback period from two years to 18 months.[72]

Remainder of page intentionally left blank

---

[69] JX 8 at 2.

[70] JX 9 at 15; Tr. 120:1–13 (Kotler).

[71] JX 8 at 11 (providing that the warrant "shall immediately terminate and be forfeited" in the event that Kotler, "during the time [Kotler] is in a consulting relationship with the Company or during the eighteenth (18th) month period immediately succeeding the termination of such consulting arrangement" engages in certain specified non-competition or non-solicitation activities). *See also* JX 9 at 24 (reflecting Kotler's proposed language in redline); Tr. 210:11 (Marissa).

[72] *See* JX 9 at 25. Kotler also proposed replacing "a reasonable time" with "ten (10) business days" in Section 3, and "five (5) days after receipt" with "ten (10) days after receipt" in Section 6(b)(ii). JX 9 at 17–18.

The Company rejected Kotler's edits.[73]  Neither of the Shipmans were keen to give Kotler equity if she could compete (at any time) after separating from the Company.[74]  Thus, neither party signed the August 6 Draft.[75]

### 4.  The September 5 Execution Draft

On September 5, 2007, Brahmst sent Robert a revised, unsigned draft of the warrant agreement (the "September 5 Execution Draft"), saving it as version 7 on White & Case's system.[76]  From Kotler's perspective, both parties had agreed to all terms of the warrant as of September 6, 2007.[77]  The Company thought so too.

---

[73] Tr. 408:6–8 (Robert) ("Q. Did you or anyone at the company ultimately agree to those edits?  A. No."); Tr. 211:1–5 (Marissa) (same).

[74] *See, e.g.*, Tr. 210:23–211:2 (Marissa) ("Well, she couldn't compete with the company while she was at the company anyway.  And I really felt strongly about a perpetual noncompete and a perpetual nonsolicit, so I rejected this language."); Tr. 408:2–5, 482:9–18 (Robert) (similar).

[75] Tr. 32:6–18 (Kotler).  Of course, there was nowhere for Kotler to sign the August 6 Draft; it still lacked a signature block for her.  JX 9 at 12.

[76] JX 13; JX 300; Tr. 121:12–18 (Kotler); Tr. 269:3–7 (Marissa) (testifying that this was the first "version 7" draft sent to Kotler).  Brahmst also prepared a redline on September 5. *Compare* JX 300 at 1, *with id.* at 28.  Unlike the August 6 Draft containing Kotler's proposed edits, the September 5 Execution Draft was saved on White & Case's document system.  Thus, the redline attached to JX 300 compares the September 5 Execution Draft to the June 8 Draft.  *See* JX 300 at 28 (comparing versions 6 and 7).

[77] Tr. 120:14–17 (Kotler) ("Q. Now, as of September 6, 2007, the parties had agreed on all of the terms of the warrant.  Correct?  A. Yes.").

18

Accordingly, Brahmst added an execution date—the next day, September 6—as well as a signature line for Kotler (then Wexler).[78]

On September 12, 2007, Brahmst re-sent the September 5 Draft to Robert because, apparently, Robert had not received Brahmst's September 5 transmittal email.[79] Since Brahmst never keyed Kotler's August 6 edits into White & Case's system, the execution version still misspelled Kotler's first name in the opening paragraph, even though her name was spelled correctly in the signature block.[80] Kotler's other proposed changes also did not appear in the September 5 Execution Draft.[81]

What did appear in the September 5 Execution Draft were the material terms of the warrant agreement, at least from the Company's perspective: it provided Kotler with the right to purchase 533 shares of common stock of the Company (i.e., 5% of the Company post-exercise),[82] and it included a perpetual non-compete

---

[78] JX 300 at 15, 25; Tr. 409:11–16 (Robert) (testifying that adding the date was the last step before execution).

[79] JX 301; Tr. 410:5–8 (Robert). The attachments to Brahmst's September 12 email were the same attachments to his September 5 email. JX 304; Tr. 410:9–19 (Robert).

[80] JX 300 at 2, 12; Tr. 121:24–122:2 (Kotler).

[81] *Compare* JX 9 at 17–18 (with Kotler's changes), *with* JX 300 at 4–5 (not including Kotler's changes).

[82] Tr. 136:10–12 (Kotler).

and non-solicit.[83]   Marissa testified, "[t]his is the draft, to my knowledge, that I signed and we executed."[84]

### 5. The September 12 Draft

On September 12, Robert sent the latest execution draft he had received from Brahmst to Kotler for signing (the "September 12 Draft").[85]   Though Kotler did not sign the September 12 Draft, she did save it to her computer.[86]   She then made her edits:[87]   she fixed the spelling of her name in the first paragraph[88]; she reduced the two-year non-solicit lookback period to 18 months (as she had proposed in August)[89]; she modified the reference to the Company in the opening paragraph,

---

[83] JX 300 at 2, 11 (providing that the warrant "shall immediately terminate and be forfeited" in the event Kotler takes part in specified non-competition or non-solicitation activities without any time or geographic limitations); Kotler First Dep. 108:3 (explaining "[t]o the best of her knowledge" this version contained the non-compete and non-solicit language the Company proposed); Tr. 268:18–269:1, 339:22–340:2, 385:2–9 (Marissa); Tr. 405:10–13 (Robert).

[84] Tr. 212:16–17 (Marissa).

[85] JX 301; Tr. 124:1–7, 141:15–142:6 (Kotler); Tr. 212:18–20 (Marissa).

[86] JX 301; Tr. 124:5–7 (Kotler).

[87] JX 19; Tr. 146:2–148:15, 193:8–21 (Kotler).

[88] JX 19 at 1; Tr. 123:14–21 (Kotler).

[89] *Compare* JX 9 at 25 (showing Kotler's August proposal of an 18-month lookback), *with* JX 19 at 10 (showing the return of the 18-month lookback language).

adding "(dba theBalm)" to the name "Shipman Associates, Inc"[90]; and she changed

the Forfeiture provision, adding the limiting phrase "during the time [Kotler] is in a

consulting relationship with the Company."[91]  This last edit made the restrictive

covenant even less favorable to the Company than the 18-month tail period Kotler

had proposed, and the Company had rejected, only a month earlier.[92]  The Company

never agreed to Kotler's suggested language.[93]  Indeed, neither Brahmst, Marissa

nor Robert had even seen Kotler's Forfeiture language until well after Kotler had

left the Company.[94]

---

[90] JX 19 at 1; Tr. 123:14–21 (Kotler).  This edit does not appear in any draft possessed by the Company or created by White & Case, only in drafts coming from Kotler.

[91] JX 19 § 15.11.  This specific language also had not appeared in any draft created by the Company or shared between the parties.

[92] *See* JX 9 at 24; Tr. 225:19–226:1 (Marissa).

[93] Tr. 222:18–223:1 (Marissa); Tr. 477:1–17 (Robert).  Here again, Kotler cannot recall when (or why) the Company capitulated and agreed to her backward looking restrictive covenant language when it had rejected her 18-month tail language only a month before. Tr. 126:21–128:1 (Kotler).  This simply is not credible testimony.  As I characterized the point at post-trial argument, the Company capitulating on the most controversial point in the negotiations would have been a "champagne moment" for Kotler—she would have gotten her 5% and she could have left the Company the next day to start her own competing business.  Post-Trial Argument Tr. 19.  And yet she recalls *nothing* about it.  Incredible.

[94] Tr. 543:23–545:8 (Brahmst) ("[N]o, I wouldn't have drafted this warrant. . . .  [T]here are some things in the first three lines [of Section 15] that I did not draft. . . .  The language that I drafted in Section 15 always had a different temporal test than the test that is in these first two and a half lines."); Tr. 286:16–18 (Marissa) ("So what was given to Bob [*i.e.*, Robert] was different than what Bob gave Stacey to sign.  There was a little switcheroo there."); Tr. 214:9–12 (Marissa) (testifying that Kotler "completely wonkied [sic] out the 'Forfeiture' section and put [']when she is in a consulting relationship with the company,['] which basically invalidated the entire section") Tr. 412:3–7 (Robert)

### 6. The September 17 Draft

On September 17, 2007, Kotler printed and signed her revised version of the Company's September 12 Draft and then, apparently, sent it to Robert without advising him of the significant changes she had made.[95]  It appears Robert did not carefully review the document nor did he send it to Marissa for execution.[96]

### 7. Marissa's Signature Page

The exact circumstances surrounding the transmittal of a signature page to Marissa are unclear and, of course, none of the witnesses had a clear memory of what happened.  The most credible version is that Kotler sent either a blank signature page or perhaps her marked-up version of the September 12 Draft (without advising the Company of her changes) by mail to Marissa for signature.[97]  Kotler never sent an electronic draft of her version of the warrant agreement to anyone at the

---

("Q. Does that accurately reflect the company's agreement with Ms. Kotler?  A. No. Q. Why do you say that?  A. I've never seen that language before.").

[95] JX 15; JX 19; JX 301.  *See* Tr. 127:9–128:1 (Kotler); Tr. 422:21–423:4 (Robert).

[96] Tr. 423:5–7 (Robert); Tr. 313:19–314:19 (Marissa).

[97] Tr. 321:15–322:2 (Marissa), Tr. 128:20 (Kotler) ("I sent it by mail for execution."), Tr. 124:14–127:8 (Kotler) (conceding the September 17 draft came from her system); Tr. 124:11–14 (Kotler) (conceding she likely sent the signature page to Marissa by mail).

Company.[98]  Consequently, Brahmst did not see the Kotler-edited draft until months later.[99]

The signature page Kotler sent to Marissa in San Francisco was accompanied by a return envelope with Kotler's New York address.[100]  As noted, what exactly Kotler sent to Marissa is unclear.[101]  What is clear is that Kotler sent Marissa at least a blank signature page, which Marissa signed and returned to Kotler.[102]

Assuming what she received was a signature page for the execution version of the warrant circulated by White & Case, Marissa did not re-read whatever Kotler mailed her or any other version of the warrant agreement.[103]  Instead, Marissa called

---

[98] Tr. 383:14–384:6 (Marissa).

[99] Tr. 539:8–11, 542:21–543:2 (Brahmst).

[100] Tr. 218:5–219:5, 252:10–19 (Marissa).

[101] Marissa could not remember whether Kotler sent (a) a signature page only, (b) the Company-approved version of the 533-share warrant with the perpetual restrictive covenants, or (c) the unapproved version of the 533-share warrant with the more narrow restrictive covenant language that Kotler wanted.  Tr. 213:9–12, 217:12–218:7, 221:5–10, 253:1–7 (Marissa); JX 104 ("Marissa Dep.") 115:1–13.  Marissa does clearly remember, however, that she did not sign a 502-share warrant.  Tr. 215:8–13 (Marissa); Marissa Dep. 123:2–124:16.

[102] *See, e.g.*, Tr. 219:14 (Marissa) ("It did not have any signature on it, because if it also had her signature on it, I probably would have made a copy of it or kept it or done something with it."); Tr. 260:2–3–261:4–8, 321:15–21 (Marissa).  *See* Tr. 277:20–22 (Marissa) ("Q. That signature wasn't forged.  That's your writing.  Correct?  A. You are correct.  100 percent.").

[103] Tr. 221:16–222:12 (Marissa).

Robert and asked him whether she should sign for the Company.[104] Robert told Marissa he had received Kotler's signature (erroneously assuming it was on White & Case's execution draft) and authorized Marissa to sign for the Company.[105] Marissa executed the warrant around September 17 and returned it to Kotler in New York.[106] Marissa made no copy of the signature page because, at the time, it included only her signature and a blank line for Kotler's signature.[107] The material terms of the warrant Marissa believed she had signed—and intended to sign—were "533 shares, . . . a perpetual noncompete, a perpetual nonsolicit, for 5 percent of the company."[108]

## E. Kotler's 'Wet Ink' 'Fully Executed' Warrant

After sending her signed signature page to Kotler, Marissa believed the parties had a final agreement consistent with the terms of the September 12 Draft.[109] For

---

[104] Tr. 252:10–17 (Marissa).

[105] Tr. 213:4–22, 219:1–222:12 (Marissa).

[106] Tr. 219:6–8 (Marissa). That was to be Marissa's only signature on the Warrant. Tr. 220:9–10 (Marissa); PTO ¶ 18. Upon receipt of Marissa's signature page, Kotler alone possessed Marissa's signature on the warrant. *See* Tr. 160:2–15 (Kotler).

[107] Tr. 219:12–19, 220:16–221:2 (Marissa). To reiterate, had Kotler signed the page she sent to Marissa, Marissa would have made a copy. *Id.* In order for the Company to possess a fully executed version, Kotler would have had to sign three times and she concedes that she only signed twice. Tr. 35:2–6 (Kotler); PTO ¶ 17.

[108] Tr. 222:21–223:1 (Marissa).

[109] Tr. 227:10–14 (Marissa).

her part, Kotler signed her September 17 Draft and left to visit her parents in Montreal.[110] Upon her return home on September 24, Kotler stopped off to visit Robert at his home in Connecticut.[111] It appears during this visit that Robert and Kotler agreed to decrease the share count in the warrant from 533 to 502—even though 533 represented 5%.[112] When Kotler returned to her New York apartment on September 25, she changed her Word version of the warrant from 533 shares to 502 shares ("Kotler's September 25 Draft").[113]

---

[110] Tr. 130:18–21 (Kotler).

[111] Tr. 41:2-9, 131:8–132:1 (Kotler); JX 314. Kotler stated she "visited Marissa and Robert Shipman at their home" in Connecticut. Tr. 40:17–18 (Kotler). But Marissa lives in San Francisco, and she was not at Robert's house in Connecticut on September 24, 2007. Tr. 22:21–23 (Kotler); Tr. 215:14–19 (Marissa).

[112] *See* Tr. 129:12–22 (Kotler); Tr. 231:23–232:5 (Marissa). Neither Kotler nor Robert could remember discussing the share count in the draft warrant on September 24. Tr. 131:19–22 (Kotler); Tr. 437:22–439:14 (Robert). It is likely, however, that Robert suggested the change. *See* Tr. 458:11–13 (Robert) (Robert testified that he "doubt[ed]" Kotler would have proposed to reduce her share count from 533 to 502); Tr. 273:4–8 (Marissa) (Marissa testified that "I'm pretty sure that Oliver [Brahmst] spoke to Bob and Bob told him that it was 502 shares.").

[113] *See* JX 19 (an unsigned version of the final warrant agreement, in .doc format, with a typewritten date of September 6, 2007 (the "Native Version")); JX 20 (the metadata on the Native Version recovered from Kotler's backup drive reveals the document was "last modified" on September 25, 2007 at 4:45 p.m.); Tr. 42:8–44:18, 52:2-11, 137:4–23, 147:10–148:15, 193:8–21 (Kotler). Aside from the change to the share count, the Word version of the warrant agreement on Kotler's system was identical to the September 17 Draft. *See* JX 15; Tr. 146:18–21 (Kotler). Both documents referred to the Company as "dba theBalm," and both included Kotler's altered Forfeiture language. *Compare* JX 19 (September 25 Word version) at 1, 10, *with* JX 15 (September 17) at 1, 10. The Company's execution draft (JX 300; JX 301) did not contain Kotler's Forfeiture language or the "dba theBalm" reference. Tr. 150:22–151:1 (Kotler).

25

Despite her testimony that she did not understand the impact of the changed share count,[114] the evidence reflects that Kotler knew full well what the change meant to her. Kotler created a detailed spreadsheet during the warrant negotiations to evaluate her potential equity interest in the Company.[115] She performed sophisticated calculations based on the Company's capital structure and confirmed that, while 502 shares represented 5% of the issued and outstanding shares, 533 shares was 5% of the fully diluted post-exercise shares.[116] Even so, Kotler agreed to the lower share count, seemingly without pushback, because Kotler was motivated to get the deal done.[117]

Robert told Brahmst orally about the share count change and Brahmst then prepared another execution draft on September 25 ("Brahmst's September 25 Draft").[118] In this draft, Brahmst endeavored to include all the deal points the parties

---

[114] Tr. 47:6–11 (Kotler).

[115] JX 130; Tr. 133:1–135:3 (Kotler).

[116] Tr. 133:3–136:23 (Kotler); JX 130.

[117] *See* Tr. 135:8–9 (Kotler) ("[T]hey said 502, so the number was 502. I didn't question it."); Tr. 137:2–3 (Kotler) (emphasizing the goal "was to get the documents signed"). Tr. 317:20–24 (Marissa) ("[T]here's no reason to lower your share count if you don't have incentives. . . . [T]he incentive would have been not to get caught.").

[118] *See* JX 315 (attachment); JX 316 (indicating last-modified date of September 25, 2007).

had agreed to after the September 5 Draft.[119]  It includes the correct spelling of Kotler's name and her right to purchase 502 shares of the Company's common stock.[120]  It also includes an 18-month non-solicit lookback period.[121]  It *does not* include Kotler's more narrow non-compete language.[122]  If there ever were to be a version of the warrant agreement the Company would sign off on as the final embodiment of the parties' agreement, Brahmst's September 25 Draft likely would have been it.[123]

Since Brahmst was updating the draft warrant for execution, he revised the effective date on the draft from September 6 to September 25.[124]  What happened next is not entirely clear, since memories on the next steps are dim (to put it mildly). But it appears Kotler told Robert she would simply adjust the share count on her

---

[119] *See* Tr. 233:15–22 (Marissa); JX 317 (redline comparing Brahmst's September 25 Draft to the September 5 Draft).

[120] JX 315 at 3; JX 317 at 2.

[121] JX 315 at 12; JX 317 at 11.

[122] JX 315 at 12; JX 317 at 11.

[123] *See* Tr. 276:15–22 (Marissa).  Brahmst's September 25 Draft does not contain Kotler's addition of the "dba theBalm" to the Company's name in the opening paragraph, her "ten (10) business days" language in Section 3, her "five (5) days after receipt" language in Section 6(b)(ii) or, as noted, her edit to the Forfeiture provision.  JX 315 at 3, 5–6. It does contain the Company's Forfeiture language with a perpetual non-compete.  JX 315 at 12; JX 317 at 11.

[124] JX 315 at 3.

version and then retain that version for her records.[125]  With that, Robert told Brahmst "not to work on the warrant anymore."[126]  Brahmst's September 25 Draft remained uncirculated on White & Case's system until Kotler's "fully executed" warrant surfaced in 2013.[127]

So, how did Kotler come to have a fully executed warrant in her possession that contained her narrow non-compete Forfeiture language?  From the preponderance of the evidence, the best explanation I can muster is that Kotler printed her modified September 25 Draft from her computer,[128] added her own

---

[125] *See* JX 19; Tr. 193:8–23 (Kotler).

[126] Tr. 545:24–546:2 (Brahmst); Tr. 458:17–459:2 (Robert).

[127] *See* JX 315.  Indeed, if Kotler disseminated her updated and revised electronic draft, the Company would likely have forwarded it to Brahmst, as the Company's keeper of the drafts, who would have redlined it and then detected Kotler's changes.  Tr. 384:3–6 (Marissa).

[128] At trial, I asked Kotler to drill down on this point:

> Q. And I'm just trying to understand who makes the changes to this document that reflect these later iterations of the warrant.  One of them is changing your name to reflect the correct spelling, and then one is—and I know there are other changes—but one is to change the number of shares at issue.  Who did that?  Who made those changes?  Is it your belief—I mean, I know you're not recalling sitting down at a screen with your computer and having the document up and making changes.  But is it your belief that you or someone—your lawyer or someone under your direction made these changes?
>
> A. Yes.
>
> Q. It is, okay.  All right.  I just wanted to be clear on that.

signature and attached Marissa's September 17 signature page.[129] She then kept the document in her files, but did not circulate it or discuss it with anyone at the Company.[130]

To be clear, Kotler's purported fully executed warrant permits her to compete immediately after ending her consulting relationship with the Company while maintaining her warrant rights.[131] In other words, Kotler's Forfeiture provision effectively gave the Company zero protection.[132] It is not surprising, then, that there

---

Tr. 193:8–23 (Kotler).

[129] *See* Tr. 154:5–7 (Kotler) (acknowledging her fully executed document was signed "in two different colored inks, so, presumably, it was signed not together."). Kotler initially alleged that she and Marissa both executed the warrant on September 6, 2007. JX 88 ¶ 15; JX 94 ¶ 22. She conceded at trial that this allegation was incorrect. Tr. 138:1–6 (Kotler). The night before her deposition, Kotler amended that allegation to say that the document was executed "[o]n or about September 25." JX 109 ¶ 22; Tr. 138:9–12 (Kotler). As discussed below, while the Company cries "fraud" and argues Kotler engaged in an intentional "switcheroo," I am not prepared to, and need not, go that far. Tr. 286:16–18 (Marissa) ("So what was given to Bob [*i.e.*, Robert] was different than what Bob gave Stacey to sign. There was a little switcheroo there."). Kotler may have believed she was attaching Marissa's signature to a warrant agreement the Company had agreed to. If so, she was wrong.

[130] Tr. 226:22–23 (Marissa); Tr. 164:6–10 (Kotler).

[131] JX 23 § 15 (barring competition only "during the time [Kotler] is in a consulting relationship with the Company").

[132] I say "zero protection" because, as noted above, it appears Kotler was not authorized to compete while she was in a consulting relationship with the Company. As a Canadian citizen, her North American Free Trade Agreement status in the United States appears to have allowed her to work only for the Company. Tr. 106:1–3 (Kotler) ("Q. So at the time, your TN status allowed [you] to work just for theBalm. Correct? A. It did."); Tr. 225:1–5 (Marissa) (explaining that Kotler could not compete with the Company while she worked there); Tr. 224:17–18 (Marissa) ("[Kotler's language] completely invalidates all of it. The whole thing is moot. It doesn't make any sense."); Tr. 226:3–4 (Marissa) ("I mean, it just

29

is no evidence—beyond Kotler's "fully executed" warrant—that the Company ever agreed to Kotler's version of the non-compete.[133]

## F. Kotler Resigns, Leaves the Company and Immediately Competes

By 2009, Kotler had come to believe the Company was not adequately valuing her contributions.[134] She decided it was time to renegotiate her compensation package.[135] Foremost, Kotler "want[ed] more [e]quity in theBalm. Not [w]arrants—straight equity."[136] She also wanted a 20% commission on all orders she originated, along with a periodic bonus, and she wanted the arrangement to be memorialized in writing.[137] Lastly, Kotler requested an expanded role in business decisions.[138]

---

doesn't make any sense that [Kotler's Forfeiture language] would be okay but the 18 months [previously proposed by Kotler and rejected by the Company] wasn't okay.").

[133] Tr. 151:15–18 (Kotler). *See also* Tr. 537:19–21 (Brahmst) ("It's based on a document that I worked on, but it's not a document that was produced by White & Case or by me."); Tr. 538:10–12 (Brahmst) ("The forms of warrants that I drafted included a provision in Section 15 that was different from the Section 15 that is in this warrant."); Tr. 538:3–7 (Brahmst) ("[T]here is a clause in this [purported warrant] that I had never seen . . . Section 15 of the warrant.").

[134] Tr. 53:14–54:7 (Kotler); JX 124 at 1–3.

[135] Tr. 54:10–15 (Kotler).

[136] JX 124 at 1.

[137] JX 124 at 1; JX 113 ("Kotler Second Dep.") 31:7–17.

[138] JX 124 at 1; Kotler First Dep. 20:11–13.

On May 20, 2009, Kotler presented her demands to Marissa and Robert.[139] The phone conversation did not go well; Marissa and Robert rejected all of Kotler's demands prompting Kotler to announce she would resign from the Company.[140] Nevertheless, Kotler agreed to stay on for an interim period to help onboard her replacements.[141] On May 26, 2009, Kotler could no longer access her Company

---

[139] Tr. 55:9–57:13 (Kotler); JX 117 at 28.

[140] Tr. 57:1–10 (Kotler); JX 124; JX 117 at 27 ("i realize how miserable marissa and her dad made me—i was totally abused and taken advantage of for so many years . . ."). Kotler married around this time and received her green card. JX 117 at 2–3, 23. She could now leave the Company and start her own business.

[141] Tr. 57:11–19 (Kotler); JX 117 at 28; Tr. 290:3–13 (Marissa). Kotler initially swore that her termination took full effect on June 9, 2009. JX 88 ¶ 5 (Complaint); JX 94 ¶¶ 7, 27 (First Amended Complaint); Kotler First Dep. 32:5–6, 36:4–7 (confirming she "believed that that date was correct"). When it became clear the Company would take the position that Kotler was soliciting customers and competing prior to her resignation on June 9, and thereby forfeited her warrants even under her version of the Forfeiture clause, Kotler amended her complaint and her sworn testimony to say that she actually resigned on May 26, 2009. *See* JX 109 ¶ 7; Tr. 61:13–62:6 (Kotler). While I could hold Kotler to her earlier sworn testimony as an admission, *see, e.g.*, *AT&T Corp. v. Lillis*, 953 A.2d 241, 257 (Del. 2008) (stating that "a party may offer earlier versions of its opponent's pleadings as evidence of the facts therein" (internal quotation marks omitted)); *Bruce E.M. v. Dorothea A.M.*, 455 A.2d 866, 869 (Del. 1983) (holding "pleadings which have been superseded by amendment . . . may be taken as admissions against the interest of the pleading party with respect to the facts alleged therein"), and thereby could find she forfeited her warrant even under her version of the warrant agreement, I need not address that issue as I am satisfied Kotler has not proven her version of the warrant reflects a binding contract between the parties.

email account.[142] By June 1, 2009, she was no longer a participant in the Company's health insurance plan.[143]

As Kotler prepared to the leave the Company, she began to explore her options for next steps.[144] She sent cover letters and her resume to potential new employers.[145] She also brainstormed the idea of starting her own cosmetics consulting business and began to plant seeds to form that business.[146] As part of that

---

[142] Tr. 61:13–14 (Kotler); Tr. 226:24–227:6 (Marissa); JX 24; JX 25. On May 26, 2009, Jordana Shipman, Marissa's sister, went to Kotler's New York apartment to retrieve Kotler's Company laptop. Tr. 61:2–9 (Kotler), Tr. 293:14–16 (Marissa). Kotler could no longer access her corporate email account without that laptop. Tr. 61:2–12 (Kotler). On the same day, Kotler reached out to her friends, colleagues and clients from her personal email account and her personal Facebook account's messaging service to inform them of her separation from the Company. JX 24 at 1 ("After 6 years with theBalm, I have decided that it's time to make a change. I am leaving my role as VP of Sales as of today."); JX 25 ("I want to let you all know, that today is my last day at theBalm."); JX 117 at 32 ("[H]aving kind of a crazy week. [J]ust left my job at thebalm after 6 years"); *Id.* at 17 ("[O]bviously you've heard by now that [I]'ve left thebalm.").

[143] Lourie Dep. 65:12–17 ("Q. When did Ms. Kotler receive healthcare benefits from the company? . . . THE WITNESS: I have been unable to verify when it started, but I can tell you it concluded June 1st of '09.").

[144] JX 117 at 14 ("I just left and went out on my own in May—all new and exciting.").

[145] *See, e.g.*, JX 29; JX 31.

[146] Kotler First Dep. 150:15–17 ("Post-May 26 . . . the initial thoughts for Smart Beauty Now were coming to be."); JX 125 at 1 (stating "in May of 2009 Smart Beauty Now was born"); Tr. 171:10–17 (Kotler) (testifying she owned, managed and controlled Smart Beauty Now); JX 125 (Smart Beauty Now mission statement).

process, Kotler began contacting Company accounts and competitors.[147] On May 28, 2009, Kotler reached out to a representative of Sohum Cosmetics, stating that while she was still "enjoy[ing] her position at theBalm Cosmetics," she wanted to pitch an idea for a new competing venture.[148] During this time, Kotler recruited a Company employee, Danielle Crepeau, to work at her new competing firm, Smart Beauty Now.[149]

**G. The Shipmans Learn of Kotler's 'Fully Executed' Warrant**

On July 24, 2009, approximately one week before she incorporated her competing venture, Kotler *subito* sent a letter to the Company in which claimed she held a 502-share warrant and requested notice of any Triggering Event (the "Confirmation Letter").[150] Kotler sent the Confirmation Letter by certified mail

---

[147] *See* Tr. 99:19–100:5 (Kotler). Kotler acknowledges her "database" and "network" included Company customers and clients. Tr. 169:4–21 (Kotler); *see also* JX 26; JX 29; JX 30.

[148] JX 27. Kotler went on to say that she maintained "a database of over 5,000 potential accounts, and a tremendous network of boutiques, spas, and salons that [she had] established over the last several years." *Id. See also* Tr. 192:4–193:2 (Kotler) (when confronted with the fact that this email (JX 27) strongly suggests she was competing with the Company while still "enjoying her position there," Kotler in essence acknowledged she was not being truthful with the recipient of the email); JX 117 at 12, 18 (Kotler writing on May 28, 2009, that she was "thinking about a change" despite her testimony that she had already resigned as of May 26, 2009).

[149] *See* JX 117 at 24; Tr. 228:15–17 (Marissa).

[150] JX 34; Tr. 160:16–161:2 (Kotler). Kotler thoroughly explained her motive for sending the Confirmation Letter at trial but, at her deposition, she could "not recall" what prompted

and copied an attorney.[151]  She did not enclose her version of the warrant, however.[152] From Marissa's perspective, therefore, the warrant to which Kotler referred was for 533 shares with a Forfeiture provision that contained a perpetual non-compete and non-solicit.[153]  Since Marissa had never seen a draft of a warrant for 502 shares, "nothing [in the Confirmation Letter] made sense" to her.[154]  Upon receipt of the Confirmation Letter, Marissa "called [Robert] and said, I got this weird letter.  And he said, put it in a file.  I said, Okay.  I put it in a file."[155]  Since the Company had no reason to believe Kotler was in violation of the Forfeiture clause of the warrant agreement, it did not respond to the Confirmation Letter or send it to White & Case.[156]

In mid-August 2009, not long after receiving Kotler's Confirmation Letter, members of the Shipman family, including Robert, saw that Kotler had a booth for

---

her to send the letter.  *See* Tr. 73:1–8, 161:7–9 (Kotler).   Indeed, the phrase "I do not recall" appears 94 times in Kotler's first deposition alone.  JX 103.

[151] JX 35; JX 36.

[152] Tr. 228:22–24 (Marissa).

[153] Tr. 227:12–14 (Marissa).

[154] Tr. 229:7–10 (Marissa) ("Nothing made sense.  This didn't make any sense.  The 502 shares didn't make any sense.  And I hadn't seen that.").

[155] Tr. 229:2–4 (Marissa).

[156] Marissa Dep. 121:13–124:5–23; Robert Dep. 151:20–24; PTO ¶ 19; JX 98 at 4–5; JX 218.

her business at the New York Gift Show very close to the Company's booth.[157]  The next day, the Shipmans took screenshots of Kotler's Facebook page to demonstrate she was competing with the Company.[158]  From then on, Marissa assumed whatever warrant Kotler had was void.[159]

Four years later, in 2013, when the Company was experiencing significant growth and was considering a possible reorganization, the Shipmans collected relevant Company books and records and saw, for the first time, a copy of the warrant agreement with Kotler's signature.[160]  They promptly sought legal advice on July 10, 2013.[161]  Brahmst recommended that the Shipmans gather evidence of

---

[157] Tr. 227:24–228:4 (Marissa); Tr. 415:9–15 (Robert).

[158] JX 54; JX 319; Tr. 396:17–398:7 (Marissa) (testifying Kotler "wasn't supposed to be competing, because [the Company] had issued her a warrant that had a perpetual nonsolicit and a perpetual noncompete").  That the Company was gathering evidence of Kotler's post-separation competition and seeking counsel on the subject is strong circumstantial evidence the Company believed Kotler's warrant would be forfeited if she competed with the Company after her separation.

[159] Tr. 228:10 (Marissa) (testifying Kotler had simply "made a choice," picking Smart Beauty Now over her rights to equity in the Company); Tr. 468:1–2 (Robert) ("[Kotler] made a business decision to do what she was going to do.").

[160] Tr. 229:18–230:1 (Marissa) (describing when she first saw a warrant with Kotler's signature); Tr. 234:1–2 (Marissa) (noting the Company had "tak[en] off" during 2013); Tr. 499:3–6 (Lourie) (stating that by the end of December 2013, "it became clear that the company, for the first time in its history, was about to become substantially profitable"); JX 70 at 8.

[161] Tr. 230:2–4, 338:2–20 (Marissa); JX 218; JX 315.

Kotler's competition.[162] Because they had already done so, the Shipmans were able to assemble their evidence very quickly.[163]

## H. The Company Reorganizes

After experiencing significant growth, the Shipmans sought to decrease their tax liability.[164] In January 2014, Shipman Associates, Inc. switched from a C-corporation to an S-corporation in order to avoid double taxation.[165] In October 2014, the Shipmans formed DISC, an interest charge domestic international sales corporation, again for income tax purposes.[166] Marissa and Robert originally wholly owned DISC, but they "agreed to offer [Chassin] shares in [DISC] in the same percentage as [her] ownership in [the Company]" in recognition of Chassin's loyalty as a Company stockholder.[167]

---

[162] JX 315 at 1 (email advising the Shipmans to "find as much misconduct as you can").

[163] *See, e.g.*, JX 42 (sending screenshots from Kotler's LinkedIn page); JX 39 (sending screenshots from her Facebook page); Tr. 335:14–336:15 (Marissa).

[164] Tr. 499:3–22 (Lourie).

[165] *Id.*

[166] Tr. 498:17–18 (Lourie); JX 81; JX 47. DISC has no operations, physical assets or employees. *Id.* It was formed by Marissa and Robert and was neither a parent nor a subsidiary of the Company. *See* JX 120; Tr. 493:2–5 (Lourie); JX 43. As an IC-DISC, DISC operates as a commissioned sales agent under its commission agreement with the Company. Tr. 492:4–9 (Lourie); JX 49. Under IRS regulations, the Company is able to deduct the commission it pays to DISC, and DISC's stockholders receive favorable tax treatment on the profits DISC earns. Tr. 492:4–23 (Lourie).

[167] JX 43; Tr. 327:2–14 (Marissa). *See also* Tr. 493:20–22 (Lourie) (explaining the Company was not required to offer Chassin equity in DISC); *Summa Hldgs., Inc. v.*

The Company completed the reorganization on December 31, 2014.[168]  First, the Company's stockholders transferred all of their Company stock to Holdings in exchange for an equal number of Holdings common shares.[169]  Then, the Company was converted into an LLC, with Holdings becoming the Company's sole holder of Class B units.[170]  Finally, the Company issued Class A units of Shipman Associates, LLC to Holdings, Robert and Chassin.[171]

---

*Comm'r*, 848 F.3d 779, 782–84 (6th Cir. 2017) (noting "[a] DISC's shareholders often will"—but need not—"be the same individuals who own the export company"). Nevertheless, for nominal consideration, the Company provided Chassin 2.24% of the issued and outstanding shares of DISC matching the percentage ownership Chassin held (and still holds) in the Company.  Tr. 326:7–12 (Marissa); JX 47; JX 96; JX 43; Lourie Dep. 69:11–13.

[168] Tr. 499:3–22 (Lourie); JX 68 at 2.

[169] JX 58; JX 68 at 2–3.  At the time of the reorganization, the Company's common stockholders were Marissa (7,400 shares), Robert (2,400 shares) and Hillary Chassin (223 shares)—for a total of 10,023 shares.  JX 68 at 3.  The Company, however, completed the Reorganization on the false belief that Marissa held 7,332 shares, Robert held 2,444 shares and Chassin held 224 shares—for a total of 10,000 shares.  JX 68 at 2–3. In November 2016, the stockholders ratified the Reorganization and the incorrect share ownership figures.  JX 68.

[170] JX 57; JX 68 at 3–4; JX 46 at 1 (Plan of Conversion ¶ 6).

[171] PTO ¶ 25.  *See also* JX 83 (capitalization table displaying post-issuance capital structure); JX 206 at Tab "A4|Facts," Cell B14 (confirming issuances were made on 12/31/2014).  Kotler found out about the conversion through counsel in August 2016, and about the reorganization and equity issuances through discovery in this action.  Tr. 87:6–88:20 (Kotler).

The Company also began to make distributions to equity holders in 2014.[172] After its reorganization, the Company made distributions to its holders of Class A units: Holdings, Robert and Chassin.[173] Holdings then paid dividends to its three stockholders: Marissa, Robert and Chassin.[174] DISC also paid dividends to its stockholders for tax years 2014–18.[175]

## I. The Company Pursues a Sale

The Company launched a sale process in 2016 and hired a team of advisors.[176] Specifically, the Company retained Lazard Middle Market LLC as its financial advisor and White & Case as its legal advisor.[177] The Company then hired Heather Lourie as a consultant to "prophylactically analyze the [C]ompany from a potential buyer's perspective and help the [C]ompany prepare for a transaction."[178] The

---

[172] JX 96; JX 115; PTO ¶ 29. From 2014 through 2017, the Company, Holdings and DISC collectively distributed approximately $39 million to their equity holders. *Id.* Because the Shipmans believed her warrant had been forfeited, neither the Company nor any of its affiliates made any payments or transfers to Kotler in connection with any dividends or distributions. Tr. 91:21–23 (Kotler); Tr. 228:10–14 (Marissa).

[173] JX 96; PTO ¶ 30; Tr. 182:18–21 (Kotler) (conceding the Company paid no distributions to DISC).

[174] JX 96; PTO ¶ 30.

[175] JX 96.

[176] Tr. 237:4–21 (Marissa); PTO ¶¶ 34, 36; Tr. 508:1–510:20 (Lourie).

[177] JX 72 at 2; JX 86.

[178] Tr. 491:11–13 (Lourie).

Company also engaged a controller and a staff accountant to repair and improve its recordkeeping.[179]

After reviewing the Company's files, Lourie found the Kotler-signed September 17 Draft of the warrant in Robert's Connecticut office—but she did not find any fully executed version or any 502-share version.[180] For the sake of achieving clarity as the Company prepared itself for sale, Lourie recommended that the Company "investigate" and "resolve" the warrant matter.[181]

In July 2016, the Company retained Jonathan Dennis, a California attorney who had previously worked at White & Case, to contact Kotler and determine what versions of the warrant she had in her possession.[182] On August 23, 2016, Kotler

---

[179] JX 78 at 12. As noted, the Company's record keeping and record retention practices were sloppy. Marissa was (and is) a creative force but she lacks basic business instincts. For his part, Robert joined his daughter to add his business acumen to the Company but he demonstrated a lack of attention to detail when it came to documenting important Company decision making. That experts were needed to locate or reconstitute Company records in advance of the sale process speaks volumes.

[180] Tr. 502:22–504:11 (Lourie).

[181] Tr. 505:3–6 (Lourie); JX 228; JX 230.

[182] Tr. 240:13–17 (Marissa) ("Because we didn't have anything . . . Heather [Lourie] wanted to figure out where we were, and she didn't like surprises, so she was like, Figure it out."); JX 60; PTO ¶ 37; Dennis Dep. 10:23–11:2, 13:15–21. Around July 8, 2016, Dennis called Kotler and left a voicemail. JX 60; Tr. 78:14–79:21 (Kotler). Dennis indicated he had been retained by the Company to help clean up its corporate records, and he asked for a copy of the fully-executed warrant agreement. JX 60; Tr. 79:6–14 (Kotler).

39

replied through counsel, who provided a copy of her version of the warrant.[183] After receiving Kotler's "fully executed" version of the warrant, Marissa's husband, Andre Hakkak, who had been friendly with Kotler prior to her involvement with the Company, reached out to the Kotlers in a botched effort to resolve the dispute that was beginning to percolate.[184] When those efforts failed, litigation followed.

## J. Procedural Posture

Kotler filed this lawsuit on June 16, 2017.[185] The Court held a two-day trial on November 27 and 28, 2018. Having read the pretrial briefs, I made clear at the start of trial that my verdict would likely turn on the credibility of witnesses since the applicable law was relatively straightforward and basically undisputed.[186]

During her deposition, it became clear that Kotler intended to rest her case on her "fully executed" warrant with its "wet ink" signatures.[187] She recalled virtually

---

[183] Tr. 81:22–82:7 (Kotler); JX 61; JX 62; JX 63; PTO ¶ 38.

[184] Tr. 239:9–24, 346:6–13 (Marissa); JX 116. Hakkak began his communications with the Kotlers by cajoling and ended them with threats. Tr. 86:4–14 (Kotler). His involvement with the Kotlers did nothing to advance the Company's cause. Marissa would have been far better off if she had addressed the matter directly. Tr. 239:21–24 (Marissa) (testifying that she did not review or approve her husband's communications with the Kotlers).

[185] JX 88. This filing was eight days following a Wall Street Journal article reporting the Company was worth $600 million. JX 87.

[186] Tr. 5:12–6:8.

[187] *See, e.g.*, Kotler First Dep. 125:18–19 ("I don't remember, but I have an executed agreement."), 128:23–129:3 ("I do not remember how the actual signature process came to

nothing about the warrant negotiations or execution.[188]  At the pretrial conference, I emphasized that Kotler would "have a burden to demonstrate that there was an agreement."[189]  Apparently, this admonition sparked a recuperation of her memory at trial.[190]

## II. ANALYSIS

"To prevail on a breach of contract claim, the plaintiff must [first] prove the existence of a contract."[191]  Kotler was obliged to meet this burden with proof by a

be, but I have an executed warrant agreement with both of our signatures on it with an agreed upon document.").

[188] Indeed, at her first deposition, Kotler's constant refrain was she did not know or did not recall anything relating to the warrant negotiations or how it came to be executed by the parties.  *See, e.g.*, Kotler First Dep. 12:12, 45:15, 47:6, 48:8, 49:10, 50:11–52:4, 60:16–24, 61:14, 72:3, 73:5–13, 84:5–20, 85:3–89:23, 90:1–95:22, 98:11–100:3, 102:7, 104:7, 107:16, 110:15, 112:6, 114:8, 115:6–119:12, 121:23, 122:3, 124:3, 125:11–18, 126:1–130:21, 132:19–136:14, 157:6, 189:4, 191:1, 197:12–19.

[189] Telephonic Pretrial Conference on Pl.'s Mot. *in Limine* and Pl.'s Mot. to Strike at 5.

[190] *See, e.g.*, Tr. 111:23–114:11 (Kotler).

[191] *Zayo Gp., LLC v. Latisys Hldgs., LLC*, 2018 WL 6177174, at *10 (Del. Ch. Nov. 26, 2018).  *See also Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *19 (Del. Ch. Oct. 10, 2006) (same).  I note each of the drafts of the warrant agreement that were circulated after the initial draft contained a New York choice of law clause.  As to matters of contract formation and interpretation, however, Delaware and New York law are not in conflict.  *See Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 90 (Del. Ch. 2008).  Since the conflict is "false," I look to both Delaware and New York law for basic principles.  *See Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *8 (Del. Ch. July 21, 2000) (Strine, V.C.) (discussing the doctrine of "false conflicts").  In reaching this conclusion, I acknowledge that Defendant would have me apply Delaware law since the warrant's choice of law provision, like the rest of it, is invalid and the dispute is more closely related to Delaware than New York.  *See Restatement (Second) of Conflict of Laws* § 200 (1971) ("The validity of a contract, in respects other than capacity and formalities, is determined by the law selected by application of the rules of §§ 187–88."); *see also id.*

preponderance of the evidence.[192]  In deciding whether Kotler carried her burden of proving that a binding contract was created, I must first consider whether Kotler proved that the parties reached a meeting of the minds.[193]

## A. Kotler Failed To Demonstrate a Meeting of the Minds

To form an enforceable contract, the parties must have a meeting of the minds on all essential terms.[194]  "Whether both of the parties manifested an intent to be bound is to be determined objectively based upon their expressed words and deeds

---

§ 188 (referencing "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties").  While this may be an accurate assessment of the choice of law analysis, I need not go there because, again, the conflict is "false."

[192] "Proof by a preponderance of the evidence means proof that something is more likely than not.  It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."  *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at \*17 (Del. Ch. Oct. 23, 2002) (internal quotation marks omitted) (quoting *Del. P.J.I. Civ.* § 4.1 (2000)).  Put another way, if the Court is unable to discern what likely is or is not the truth, then the plaintiff has not carried her burden.  *Cuonzo v. Shore*, 958 A.2d 840, 844 (Del. 2008) ("If the evidence is evenly balanced between the parties, then the plaintiff has failed to meet his burden.").

[193] *Morton v. Evans*, 1998 WL 276228, at \*1 (Del. Ch. May 15, 1998); *accord Fried v. Kelly*, 2007 WL 1821697, at \*6 (S.D.N.Y. June 26, 2007) (noting the party contending a contract was formed has the burden of showing the parties mutually intended to be bound), *aff'd*, 317 F. App'x 86 (2d Cir. 2009).

[194] *See Ramone v. Lang*, 2006 WL 4762877, at \*11 (Del. Ch. Apr. 3, 2006) (Strine, V.C.) (finding there was no binding contract because "[t]he record is clear that [the parties] never reached accord on the final terms of those instruments"); *Schurr v. Austin Galleries of Ill., Inc.*, 719 F.2d 571, 576 (2d Cir. 1983) ("Under New York contract law, the fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties.  If there is no meeting of the minds on all essential terms, there is no contract.") (citations omitted).

as manifested at the time rather than by their after-the-fact professed subjective intent."[195] "[I]f the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract."[196] As our Supreme Court recently reiterated, "all essential or material terms must be agreed upon before a court can find that the parties intended to be bound by it and, thus, enforce an agreement as a binding contract."[197]

At first glance, a wet ink, signed version of a contract looks to be solid evidence of a meeting of minds. But it is not evidence so powerful that it negates all other evidence to the contrary. Put another way, even if a purported agreement is executed by both parties, when the parties' "understandings of [a contractual] prohibition or permission are incompatible," and where the plaintiff "offered no

---

[195] *Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014) (internal quotation marks and citation omitted).

[196] *Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397–98 (S.D.N.Y. 2011) (internal quotation marks omitted) ("Even if the parties intend to be bound by a contract, it is unenforceable if there is no meeting of the minds, i.e., if the parties understand the contract's material terms differently.") (alteration in original) (internal quotation marks omitted).

[197] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018) (stating that "in resolving this issue of fact, the court may consider evidence of the parties' prior or contemporaneous agreements and negotiations in evaluating whether the parties intended to be bound by the agreement") (footnote omitted).

further evidence indicating" a meeting of the minds, "no enforceable agreement [is] created."[198]

Kotler's proffered "wet ink," "fully executed" version of the warrant agreement does not overcome the credible and convincing evidence that these parties were not operating from the same page, or more precisely the same agreement, as they negotiated its material terms. The circumstances surrounding the execution of the warrant agreement, cloudy as they are, reflect it is just as (if not more) likely Marissa believed she was signing a version with a perpetual non-compete as one with Kotler's diluted covenants. This is particularly so since Kotler could recall nothing of importance regarding the negotiations or circumstances surrounding the execution of the warrant agreement. Incredibly, she could not even recall who she engaged as counsel to represent her during the negotiations, thereby cutting off a likely source of contemporaneous evidence. The Company had already rejected

---

[198] *Id.* at 398–99. *See also Ramone v. Lang*, 2006 WL 4762877, at *11 (Del. Ch. Apr. 3, 2006) (Strine, V.C.) ("If terms are left open or uncertain, this tends to demonstrate that an offer and acceptance did not occur."); *Schurr*, 719 F.2d at 576 (where two parties executed a consent judgment, but certain language rendered it "an utter nullity," the court held "there was no meeting of the minds on the meaning of the crucial language regarding scope, and that, consequently, the consent judgment must now be declared a nullity and unenforceable."); *Jackson v. Nocks*, 2018 WL 1935961, at *6 (Del. Ch. Apr. 24, 2018) ("Plaintiff fails to identify a single piece of contemporaneous evidence that reflects any negotiation, let alone any agreement, to these terms. Therefore, I find that the Parties did not create an enforceable contract under Delaware law.").

Kotler's proposed 18-month tail.[199]  Yet Kotler could recall nothing about the circumstances surrounding the Company's abrupt decision to agree to a Forfeiture clause that contained no forward-looking non-compete.  Given that this was the key area of disagreement, it is reasonable to expect that the party who got the better of this deal term would remember something about when and how that occurred.  That Kotler could not undermined her credibility.

Other contemporaneous and after-the-fact circumstantial evidence further reveals the disconnect.[200]  If Kotler's warrant reflected the final operative agreement, why did White & Case prepare the Brahmst September 25 Draft—the draft that was, from the Company's perspective, meant to be the final execution draft—and why did that draft not contain Kotler's more narrow Forfeiture clause? [201]  If Kotler's warrant reflected the final operative agreement, why would the Shipmans have scrambled to gather evidence of Kotler's post-employment competition?[202]  That evidence would serve no purpose if the parties had agreed Kotler could compete the moment she separated from the Company.

---

[199] Tr. 225:15–226:4 (Marissa).

[200] Delaware courts consider the "parties' actions following the deal [as] informative" of whether they reached a meeting of the minds.  *Trexler v. Billingsley*, 2017 WL 2665059, at *4 (Del. June 21, 2017) (ORDER).

[201] *See* JX 317.

[202] JX 39; JX 42; JX 54; JX 319; JX 320; JX 321; JX 323.

Moreover, while perhaps not as focused on details as one might expect of a CEO, Marissa's testimony that she would never agree to the Forfeiture language in Kotler's warrant—language that would allow Kotler to take equity in the Company and then leave to compete with the Company the next day—was credible.[203] Absent credible evidence as to *why* the Company would have agreed to this, I have no reason to believe the Company would ever have waivered from its position that Kotler's post-separation competition was a deal-breaker.[204]

## B. I Decline to Reach Defendant's Fraud Defense

Defendant urges me to find that Kotler's purported warrant is the product of fraud. Specifically, it contends that Kotler, knowing the Company would not agree to her Forfeiture language, orchestrated a scheme to secure Marissa's signature by fraud and then affixed that signature to a version of the warrant agreement the Company had never seen nor agreed to. While I agree the preponderance of the evidence supports that Marissa had not seen Kotler's version of the warrant when she executed the signature page Kotler mailed to her, that Kotler then appended that signature page to her warrant, and that Kotler then proffered that "fully executed" warrant as the definitive agreement, I need not grapple with the competing evidence

---

[203] Tr. 241:20–242:3, 398:8–18 (Marissa); Tr. 413:3–14 (Robert) (same).

[204] *See* Tr. 208:4–209:3 (Marissa); Tr. 413:3–14, 468:1–11 (Robert).

regarding Kotler's mental state, or *mens rea*, as these events unfolded.[205]  I have found the parties failed to reach a meeting of the minds regarding a material term (the Forfeiture clause).  That is enough to enter judgment for the Defendant.[206]

### III.  CONCLUSION

Because I find Plaintiff did not prove the existence of a valid contract, I find she has not proven a breach of contract.  She also has not proven her claims for declaratory judgment or breach of the implied covenant of good faith and fair dealing.  My verdict, therefore, is for Defendant.  The parties shall confer and submit an implementing final judgment and order within ten (10) days.

---

[205] *See, e.g.*, Tr. 305:19–22 (Kotler) ("Q. Would you agree with me, though, that sending a doctored document to your boss is a good way to get fired?  A. Yes, I do.").

[206] *Black Horse Capital, LP*, 2014 WL 5025926 at *12 (internal quotation marks omitted) (To accept a contract, parties must demonstrate a clear showing of assent "based upon their expressed words and deeds as manifested at the time[.]").